**HOFFMANN & BARON, LLP**
**Andrea Marie Wilkovich**
**6 Campus Drive**
**Parsippany, New Jersey 07054**
**Telephone:  (973) 331-1700**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| **Claire Neuner,**                 ) | |
|           ) | |
|      *Plaintiff,*     ) | |
|     ) | Civil Action No. 1:14-cv-03776-RBK-JS |
| vs.                ) | Hon. Robert B. Kugler, District Judge |
|     ) | Hon. Joel Schneider, Magistrate Judge |
|     ) | |
| **Selective Insurance Company**   ) | Amended Complaint |
| **of America,**          ) | |
|     ) | JURY TRIAL DEMANDED[1] |
|     *Defendant.*    ) | |

### AMENDED COMPLAINT

Plaintiff, Claire Neuner ("Neuner"), for her complaint against defendant, Selective

Insurance Company of America ("Selective"), alleges as follows:

### IDENTIFICATION OF PARTIES  (LOCAL RULE 10.1)

1.      The names and addresses of the named parties to the action are as follows: (i) Plaintiff

Claire Neuner ("Neuner"), 4301 S. Long Beach Boulevard, Holgate, New Jersey 08008; and (ii)

Defendant Selective Insurance Company of America ("Selective"), which upon information and

belief, is a New Jersey corporation that is headquartered at 40 Wantage Avenue, Branchville, NJ

07890.

---

[1] Subject to the Entry of the Hurricane Sandy Case Management Order No. 1 dated March 24, 2014 ("H5CMO").

## JURISDICTION AND VENUE

2.      This is an action for breach of the Standard Flood Insurance Policy ("SFIP"), issued to

Neuner and administered by Selective and for the bad faith failure by Selective to pay Neuner's

claim for the damage done to her home by Super Storm Sandy.  Jurisdiction is based on 42

U.S.C. §4053, and 28 U.S.C. §1331 and §1367.  Venue is proper under 28 U.S.C. §1331, 42

U.S.C. §4053 and the venue provision of the SFIP.

## PARTIES

3.      Claire Neuner owns the beach-front home and property located at 4301 S. Long Beach

Boulevard, Holgate, New Jersey, 08008.  She is the holder of SFIP Policy No. FLD 1181088

issued by Selective.

4.      Upon information and belief, Selective is a New Jersey corporation that is headquartered

at 40 Wantage Avenue, Branchville, NJ 07890 and is operated as a subsidiary of Selective

Insurance Group, Inc.  Selective has partnered with the Federal Emergency Management Agency

("FEMA") in a program known as the Write Your Own ("WYO") Program.  Under the WYO

Program, Selective issued and serviced SFIP Policy No. 1181088.

## FACTS

5.      4301 S. Long Beach Boulevard, Holgate, New Jersey is a contemporary three-story

house.  It is Mrs. Neuner's primary and only residence.  After Super Storm Sandy rendered her

home uninhabitable, she took temporary lodging in several locations, the last of which was 225

Wildwood Lane, Naples, Florida.  On June 20, 2013 she moved back into her partially repaired

Holgate home.

6.      Before Super Storm Sandy made land fall on October 29, 2012 the home and property

were maintained in mint condition.  The property was fully landscaped.  The driveway leading

up to the garage of the house was constructed with brick pavers.  A raised walkway extended

from the front entry patio around the northern perimeter of the house.  This walkway joined

another walkway that led to a pathway to the beach.  All of these improvements were destroyed

on October 29, 2012 when Super Storm Sandy, with its massive storm surge, swept across the

insured property during a full moon high tide.

7.      The surging ocean leveled a protective dune and swept away up to eight (8) feet of the

property.  Everything below the second floor of the house was destroyed; i.e. an entry patio, a

tiled foyer, including two closets in one of which a water heater had been installed, entry front

and storm metal doors providing access to the foyer from the entry patio, windows adjacent the

front door, a garage door,  a Lift Master garage door opener, a garage with an engineered cement

floor, doors leading from the garage to the entrance foyer and to an outside shower area; an

outside shower area located within the footprint of the house; an HVAC system with all of its

duct work; enclosed air conditioning units; electrical wiring,  a 200 amp circuit breaker panel;

the stairs leading from the foyer to the second floor; wood-framed walls finished with drywall on

the inside; and various items of personal property, including a Stickley outdoor dining set, five

(5) surf boards, wet suits, beach umbrellas, chairs and towels.

8.      The surging water also ripped away the siding and trim on the lower halves of all the

walls of the house.  The water pressure also pulled or helped to pull the siding and trim off the

upper half of the south wall of the house.  Approximately eight (8) feet of land was washed away

by the storm surge.  The water filled the first floor and waves buffeted the second floor of the

house.

9.      The storm left debris, including wood, boulders, cement, glass and brick strewn all over

the insured property.  The clean-up was extensive.  So too was the demolition of wiring,

ductwork, pipes and water heater that hung unsafely from the house.  Temporary cross-bracing

of the pilings had to be and was installed on all four sides of the house.

10.     Mrs. Neuner sought relief under the flood claim policy.  Consequently, Selective hired

the adjustment firm CNC Catastrophe and National Claims of Mobile, Alabama ("CNC") to

investigate Mrs. Neuner's claim. On November 5, 2012, CNC assigned the claim to public

adjuster Patrick Reynolds.  Along with the contractor A. Richard Aitken, Jr. ("Aitken"), whom

Mrs. Neuner had hired to repair her damaged home, Reynolds inspected the property on

December 10, 2012.  Shortly thereafter Reynolds recommended that an advance payment of

$5000.00 be made to Mrs. Neuner to cover, in part, the emergency repairs made to her home by

Aitken.  Selective approved Reynolds' recommendation.

11.     In his report justifying the advance payment of $5000.00, Reynolds noted that the flood

waters had risen 96 inches inside the house and caused "extensive damage to the foundation,

piling system, finished floors, walls, cabinetry, doors, windows, electrical system and

heating/cooling system." Reynolds went on: "Due to the caustic nature of salt water any metallic items will need to be replaced, i.e.; Furnace, water heater, garage door, storm doors and metal entry doors. Due to heavy wave action and the force of high velocity water flow, the first floor above BFE is washed away entirely along with the engineered slab and 6'+ of soil under the foot print, as well as surrounding grade. Although not covered, all decorative landscaping, pavers, patios, and a concrete drive are gone as well. Emergency services were required to shut off electrical, water, and sewer to prevent additional damages and to shore and stabilize the structure. An engineer has been requested to assist in the determination of the best repair processes and the extent of coverage. The lower floor consisted of an entry foyer, storage and garage space. The walls are wood framed and finished with drywall on the inside. The exterior was clad with t&g sheathing, vapor barrier, and wind rated vinyl siding. All effects of the first floor have been compromised."

12.     Reynolds was kept fully informed of the repairs that Aitken was making to the Neuner home. He met with Aitken and was given copies of Aitken's bills. The bills are dated February 25, 2013 and April 23, 2013. As of April 23, 2013, the bills totaled $101,854.55. Reynolds was also provided with a detailed spreadsheet showing the projected final repair and replacement costs. At the time, the projected cost was $282,864.00.

13.     Sometime in mid-April 2013, Reynolds filed with Selective and served on Neuner, *inter alia*, an unexecuted Proof of Loss, including an unexecuted Sworn Statement in Proof of Loss, a Final Report, and a Valuation Report. These papers make no mention of the repair and replacement costs incurred by Neuner. Rather, they hypothesize a figure, $33,271.53, which is

said to be the full cost of repair or replacement of the storm-damaged Neuner home. With these papers, Selective tendered Neuner a check in the amount of $23,271.53.

14.     Neuner sought an explanation from Reynolds for the unrealistic and low-ball figure that Reynolds had hypothesized.  She was informed that Michael Cazalas, another CNC public adjuster, was now responsible for Neuner's claim.  It was for this reason that, on May 29, 2013, Neuner served Cazalas, as well as Selective, with her "Objections and Counter Statements of Loss by the Insured, Claire Neuner, Policy No. FLD1181088, to the Final Report Prepared by CNC Catastrophe and National Claims of the Loss Suffered on October 29, 2012 by the Premises 4301 S. Long Beach Blvd, Holgate, Long Beach Island, NJ 08008, as a Result of Super Storm Sandy".

15.     Taking no action on Neuner's objections and counterstatement of loss, upon information and belief, Cazalas turned Neuner's claim over to his employer, CNC.  On June 25, Neuner's counsel received a telephone call from CNC's Michael Calhoun.  Calhoun told Neuner's counsel that CNC/Selective was going to deny Neuner's claim and that, based on an engineering report, Neuner was "lucky" that Selective had paid her what it did, namely $28,267.53.  Neuner's counsel confirmed his conversation with Calhoun in writing the next day, June 26, with copies being sent to Selective's executives, George Neal and Michael Zondory.  Counsel also asked Calhoun to "advise me of the name and address of the engineer and provide me with any report or written evidence of such an engineering inspection".  The request was ignored.

16.     Selective denied Neuner's claim three weeks later on July 17, 2013.  The denial is in bad

faith.  It never addresses Neuner's Objections and Counterstatements of Loss.  It refers to the

engineering report, asked for but never given to Neuner's counsel, that betrays a singular lack of

knowledge of the insured premises and the damage done to the insured premises as a result of

Super Storm Sandy.  Item 1 of the denial describes the Super Storm Sandy as a "flood event" and

as having "scoured up to 38 inches of soil from beneath the building".  Item 2 suggests that the

engineer may have inspected the wrong house.  None of the allegedly observed structural

anomalies applies to the Neuner home, and Neuner has made no claim for reimbursement of the

cost to repair these phantom anomalies.  Selective's analysis of the coverage provided by the

NFIP flood insurance policy essentially nullifies the coverage. It does so by turning the policy on

its head.


17.     In its coverage-nullifying misreading of the policy, Selective interprets Section III A.8 as

a limit on the basic coverage of Sections III A.1. and III A.2.  However, Section III A.8. *adds*

coverage; it does not *subtract* coverage. According to Selective:  "2. Doors located in the

enclosure; 3. Damages to outside shower area; 4. Garage door and opener located in the

enclosure; 5. Wood framed walls with finished drywall in the enclosure; 6. Windows located in

the enclosure; 7. Siding and trim located in or on the enclosure; 8. Tiled foyer located in the

enclosure; 9. Finished closet located in the enclosure"; are not covered because none of these

parts of the insured dwelling are among the items of property enumerated in Section III A.8.

Selective's interpretation is quite simply wrong and manifestly so.

18.     The basic building coverage of Section III A.1. and III A.2. applies to the entire dwelling; it is not limited to the floors above floor level as it would be under Selective's interpretation. For the Neuner home, Selective would read out of existence insurance coverage for the one-third of the house that is most vulnerable to a FEMA defined flood. Selective's denial was obviously a sham, and obviously a deprivation of Mrs. Neuner's right to disaster relief under her SFIP insurance policy.

19.     The full replacement cost of the property at the time of the storm was $539,251.04.  The estimate reflects a meager 6% of the full replacement cost.  The real estimate is the actual cost so incurred by Mrs. Neuner to replace her home.

20.     On August 13, 2013, Mrs. Neuner filed an appeal with FEMA from Selective's denial of her insurance claim.

21.     On December 6, 2013, FEMA rendered its decision in Neuner's appeal.  Without expressly reversing Selective's denial of coverage, FEMA asked Selective to reevaluate its denial of (1) coverage for the damages done to the lower level wall framing and diagonal bracing, 1 support pile and 16 linear feet of perimeter floor girder beneath the south side of the building and (2) Neuner's claim for the actual cost of the covered repairs.

22.     On December 18, 2013, Neuner's counsel wrote to two officers and two representatives of Selective looking to facilitate and expedite the re-examination of Neuner's claim as FEMA

required.  The letter included a side-by-side comparison of the actual costs of the covered repairs

and the same costs that were either omitted or understated by Selective.

23.      Selective never responded to counsel's letter.

24.      On January 7, 2014, Neuner's counsel served a follow-up letter on the same four

Selective employees.

25.      On January 29, 2014, Neuner's counsel was told by a Selective employee that Neuner's

claim for the actual cost of the covered repairs had been turned over to CNC.

26.      On February 6, 2014, following a conversation with CNC's Michael Calhoun on or about

January 30, 2014, Neuner's counsel wrote to Calhoun enclosing copies of the builder's, A.

Richard Aitken, Jr., "Hurricane Sandy Storm Repairs Breakdown Proposal Package" including

actual payment spreadsheets and sub-contractor invoices.  These papers showed the actual cost

of the covered repairs, the monies paid to Aitken by Mrs. Neuner, viz., $200,853.47 and the

balance still owed by Mrs. Neuner, viz., $160,374.51 for Aitken's restoration of the insured

premises.

## FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

27.     Neuner repeats and incorporates herein the foregoing paragraphs 1-25.

28.     Selective breached the SFIP it issued to Mrs. Neuner by failing to pay her $221,723.47 which is the difference between the $250,000.00 building limit of liability and the so-called final payment of $28,276.53 which Selective did make to Mrs. Neuner for the damage done to her home by Super Storm Sandy.

29.     Selective's denial of Neuner's claim was unreasonable and in bad faith, based as it was on a purposeful misreading of the plain coverage provided by the SFIP.

30.     Selective's bad faith has further manifested itself by Selective's failure to promptly reevaluate Mrs. Neuner's claim, as requested by FEMA.

31.     Selective's reasons for withholding from Neuner the full benefit of the SFIP are not even fairly debatable and the monetary losses she has sustained would have been and are clearly known and understood by Selective.

32.     Selective's bad faith has delayed the rightful payment of Neuner's claim by a year and one-half.  The delay has prejudiced Mrs. Neuner by causing her to delay all the necessary repairs to the insured premises for lack of available funds, causing her to deplete her retirement account and borrow against a home equity line of credit.

## SECOND CAUSE OF ACTION FOR BAD FAITH FAILURE

## TO PAY NEUNER'S CLAIM UNDER FEDERAL COMMON LAW[1]

33.      Neuner repeats and incorporates herein the foregoing paragraphs 1-31.

34.      As a result of Selective's bad faith in failing to promptly pay Neuner's flood insurance

claim, Neuner is entitled to consequential damages, punitive damages and an award of attorney's

fees as against Selective.

## THIRD CAUSE OF ACTION FOR BAD FAITH FAILURE

## TO PAY NEUNER'S CLAIM UNDER NEW JERSEY COMMON LAW[1]

35.      Neuner repeats and incorporates herein the foregoing paragraphs 1-33.

36.      As a result of Selective's bad faith in failing to promptly pay Neuner's flood insurance

claim, Neuner is entitled to consequential damages, punitive damages and an award of attorney's

fees as against Selective.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Claire Neuner, prays for judgment and relief against Selective.

A.      Adjudging Selective in breach of the SFIP and awarding damages to Neuner in

the amount of $221,723.47.

B.      Awarding Neuner of the full amount of consequential damages, regardless of the

$250,000.00 coverage limit of the SFIP.[1]

---

[1] Subject to the Entry of the Hurricane Sandy Case Management Order No. 1 dated March 24, 2014 ("H5CMO").
[1] Subject to the Entry of the Hurricane Sandy Case Management Order No. 1 dated March 24, 2014 ("H5CMO").

C.       Awarding Neuner prejudgment interest, reasonable attorney's fees, and all

reasonable litigation expenses from the date of institution of the lawsuit.[1]

D.       Awarding Neuner punitive damages.[1]

E.       Such other and further relief as this Court may deem just and proper.

Trial by Jury is hereby demanded.[1]

Respectfully submitted,

s/ Andrea Marie Wilkovich

Of Counsel:                                         Andrea Marie Wilkovich
Robert Neuner                                       Hoffmann & Baron, LLP
Hoffmann & Baron, LLP                               6 Campus Drive
6 Campus Drive                                      Parsippany, NJ 07054
Parsippany, NJ 07054                                (973) 331-1700
(973) 331-1700                                      awilkovich@hoffmannbaron.com
                                                    Attorneys for Plaintiff,
                                                    Claire Neuner

Dated this 17th day of July, 2014

12